OPINION
{¶ 1} Defendant, Kelly Reese, appeals from his conviction and sentence for kidnaping, aggravated robbery, breaking and entering and attempted safecracking.
 {¶ 2} Evidence presented at trial by the State demonstrates that on March 19, 2003, at around 7:30 p.m., Karen Norman, who works at the Cashland store on N. Main Street in Dayton, closed the store and drove home to her apartment on Woolery Lane. After parking her car, Ms. Norman walked around the corner of the building toward the stairs leading to her apartment. Ms. Norman heard someone say: "How are you doing?" Thinking it was a neighbor, Ms. Norman replied: "Fine." When Ms. Norman looked up she saw two men who were wearing hooded coats, ski masks and gloves. They also had guns.
 {¶ 3} The men demanded Norman's car keys and forced her at gunpoint to get into the back seat of her car. The shorter of the two men sat in the back seat next to Norman while the taller man drove the car out onto N. Main Street. The man in the backseat told Norman they wanted the keys to Cashland, the alarm code and the combination to the safe. Ms. Norman complied.
 {¶ 4} Norman could not recall whether the "off" button on the store's alarm panel was above the number "1" or below number "7". The man in the backseat next to Norman produced a yellow sheet of paper bearing a drawing of the inside of Cashland and a drawing of the alarm panel. The man held the paper to Norman's face and told her to touch the paper as though she was entering the alarm code on the drawing of the alarm panel so that he could see where the "off" button is located. Ms. Norman complied, indicating that the "off" button was under the number "7".
 {¶ 5} As they approached the Cashland store, the men put a pillowcase over Ms. Norman's head and handcuffed her. The men then stopped and transferred Ms. Norman to another car where a third man was waiting. Ms. Norman was told that the third man would kill her if she had lied about the codes for the alarm and the safe. She was also told another gunman was at her home with orders to kill her children if she gave incorrect information. The third man then drove away with Norman and stopped after one or two minutes.
 {¶ 6} After a few minutes the third man's cell phone rang. After he answered it he said to Norman: "You're dead." When Norman asked why, the man accused her of lying about the alarm code. Norman denied that she had lied, and the man told whoever he was talking to that he did not think Norman was lying. The man then drove Norman somewhere else for a short time. When he stopped his cell phone rang again. Norman heard him say: "What do you mean you got burnt? What do you want me to do?" The man again started driving whereupon his cell phone rang and Norman heard him say: "I haven't dumped her yet because there was a car behind me." Shortly after that, the man stopped, removed Norman from the vehicle and took off her handcuffs but left the pillowcase on her head. After Norman heard the car driving away she took the pillowcase off her head and tried unsuccessfully to see the car's license plate number. Norman ran to a nearby house and police were called.
 {¶ 7} Police began simultaneously investigating Norman's abduction and a report of an intruder alarm going off at the Cashland store. The surveillance video from inside the Cashland store shows two people entering. Both men seen on the video wear hooded coats, masks and gloves. Detective Hutchinson estimated that the shorter of the two men was five foot six or seven, the same height as Defendant. The tape also shows the shorter man walking to the safe and kneeling in front of it. Next to that safe police discovered a set of keys and a yellow piece of paper that had a map or drawing on it of the inside of the Cashland store, including the alarm panel. Laboratory analysis revealed that Defendant's left thumb print was on that map found near the safe. He was subsequently arrested and jailed.
 {¶ 8} Defendant was indicted on one count of aggravated robbery, R.C. 2911.01(A)(1), one count of breaking and entering, R.C. 2911.13(A), one count of attempted safecracking, R.C.2923.02(A) and 2911.31(A), and one count of kidnaping, R.C.2905.01(A)(2). A three year firearm specification was attached to the aggravated robbery and kidnaping charges. R.C. 2941.145. Defendant filed a notice of alibi. Following a jury trial Defendant was found guilty of all charges and specifications. The trial court sentenced Defendant to consecutive prison terms totaling seventeen years and eleven months.
 {¶ 9} Defendant timely appealed to this court from his convictions and sentence.
 {¶ 10} First Assignment of Error
 {¶ 11} "Appellant's convictions were against the sufficiency and/or the manifest weight of the evidence."
 {¶ 12} A sufficiency of the evidence argument challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law. State v. Thompkins,78 Ohio St.3d 380,1997-Ohio-52. The proper test to apply to such an inquiry is the one set forth in paragraph two of the syllabus ofState v. Jenks (1991), 61 Ohio St.3d 259:
 {¶ 13} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."
 {¶ 14} Defendant argues that the evidence the State presented was insufficient to prove that he was one of the perpetrators of these offenses. Karen Norman was unable to identify the perpetrators because their faces were covered by ski masks. She opined that, by the sound of their voices, they were African-American males.
 {¶ 15} The identity of a perpetrator may be proved by circumstantial evidence, such as a fingerprint found at the crime scene. State v. Franklin (1991), 62 Ohio St.3d 118, 124-125. Circumstantial evidence has the same probative value as direct evidence. Jenks, supra.
 {¶ 16} Police lifted a high quality fingerprint from a map depicting the interior of the Cashland store found lying next to the store's safe. Entry of that fingerprint into the Automated Fingerprint Identification System (A.F.I.S.) revealed that it might belong to Defendant. Subsequent comparison of Defendant's known fingerprints with the print found on the map revealed that the print was Defendant's left thumb print.
 {¶ 17} Karen Norman testified at trial that the shorter of the two men, the one who sat next to her in the back seat, held that map of the inside of the Cashland store in his hand while he showed it to Norman and demanded that she show him how to enter the alarm code. However, Norman was unsure if the man who showed her the map may have had his gloves off at the time.
 {¶ 18} The Cashland surveillance videotape shows that two men entered the store and the shorter man went to the safe and laid something down on the floor next to it. Detective Hutchinson estimated that this man was five foot six or seven. Karen Norman estimated that the perpetrator who sat next to her in the back seat, the one who showed her the map, was five foot six or seven. Defendant is that height.
 {¶ 19} Viewing this evidence in a light most favorable to the State, a reasonable trier of facts could find beyond a reasonable doubt that Defendant was one of the perpetrators. Defendant's convictions are supported by legally sufficient evidence.
 {¶ 20} A weight of the evidence argument challenges the believability of the evidence, and asks which of the competing inferences suggested by the evidence is more believable or persuasive. State v. Hufnagle (Sept. 6, 1996), Montgomery App. No. 15562, unreported. The proper test to apply to that inquiry is the one set forth in State v. Martin (1983),20 Ohio App.3d 172, 175:
 {¶ 21} "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Accord: State v. Thompkins,78 Ohio St.3d 380, 1997-Ohio-52.
 {¶ 22} The credibility of the witnesses and the weight to be given to their testimony is a matter for the trier of facts, the jury here, to resolve. State v. DeHass (1967),10 Ohio St.2d 230. In State v. Lawson (August 22, 1997), Montgomery App. No. 16288, we observed:
 {¶ 23} "[b]ecause the factfinder . . . has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." Id., at p. 4.
 {¶ 24} This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of facts lost its way in arriving at its verdict. State v. Bradley (October 24, 1997), Champaign App. No. 97-CA-03.
 {¶ 25} As Defendant correctly points out, the only direct evidence connecting him to this crime is his fingerprint that was found on the map lying next to the Cashland safe. Defendant argues that in order to conclude that this fingerprint proves his participation in this crime, the jury must impermissibly base one inference solely and entirely upon another inference. We disagree.
 {¶ 26} Multiple inferences may be drawn from the facts and evidence here. From the fingerprint and Karen Norman's testimony, the jury could reasonably infer that Defendant is the person who showed that map to Norman on the way to the Cashland store. From that plus other additional evidence, the Cashland surveillance videotape and the description of the perpetrators, including an estimation of the shorter one's height by both Detective Hutchison and Norman, the jury could separately and reasonably infer that Defendant is the person depicted in the videotape who walked to the safe and laid something down on the floor next to it. We see no violation of the rule against stacking inferences.
 {¶ 27} Defendant's primary complaint is that the jury's conclusion that Defendant was one of the perpetrators is against the manifest weight of the evidence. During the trial several defense witnesses testified that Defendant is a musician, and that some weeks prior to this crime Defendant lost a folder he always carried with him that contained his music and various kinds of blank paper. During closing arguments Defense counsel theorized that Defendant may have touched a blank piece of paper in his music folder, leaving his fingerprint on it, and later after the folder was lost that piece of paper may have been used by the real perpetrators to draw their Cashland map on. In support of this theory, Defendant points out that a comparison of his handwriting with the writing on the map failed to disclose a match. However, given the evidence presented, the jury could reasonably choose to disbelieve Defendant's theory about how his thumb print innocently got on the map.
 {¶ 28} First, the defense witnesses disagreed as to when Defendant's music folder was lost. Also, one defense witness saw Defendant using a yellow legal pad after he lost his folder and before these crimes occurred. Moreover, as the prosecutor pointed out in his rebuttal closing argument, Defendant's thumb print on the Cashland map is oriented in such a way that it does not cover the writing on the map but rather is on the edge of the paper, consistent with how Karen Norman testified the perpetrator held the map when showing it to her in the car. Additionally, although fingerprints degrade in quality over time and with changes in their environment, the fingerprint on the map was very high quality, suggesting it was fresh. Finally, that map of the inside of Cashland was found lying next to the store's safe which is not an area ordinarily accessible to customers or the public. As for Defendant's alibi, his witnesses testified that he would have necessarily been at home with his pregnant girlfriend when these crime occurred because he was always at home with her in the evening. However, not one of the alibi witnesses had any specific recollection concerning Defendant on the day these crimes occurred.
 {¶ 29} The jury in this case did not lose its way simply because it chose to disbelieve Defendant's alibi and his theory about how his thumb print might have innocently gotten on the map left at the crime scene, as it was entitled to do. In reviewing this record as a whole, we cannot say that the evidence weighs heavily against a conviction, that the jury lost its way, or that a manifest miscarriage of justice has occurred. Defendant's convictions are not against the manifest weight of the evidence.
 {¶ 30} The first assignment of error is overruled.
 {¶ 31} Second Assignment of Error
 {¶ 32} "The trial court erred in permitting jurors to take notes during trial and to refer to the notes during deliberations."
 {¶ 33} At the commencement of trial the trial court informed the jurors that note taking would be permitted, but not required. It was a matter of individual choice. The trial court cautioned the jurors that notes are merely a memory aid which does not take precedence over their independent memory, that note taking does not make that juror's recollection more reliable than that of other jurors who choose not to take notes, and that jurors must not allow note taking to divert their attention from what the witnesses are saying in the courtroom. At no time during the trial did Defendant object to the jurors being allowed to take notes.
 {¶ 34} A trial court has the discretion to either permit or prohibit note taking by jurors. State v. Waddell,75 Ohio St.3d 163, 1996-Ohio-100. Defendant complains that the jurors should not have been allowed to take notes, citing general concerns over the potential for distracting jurors from concentrating on witnesses and the evidence. By failing to object at trial, however, Defendant has waived all but "plain error." State v.Waddell, supra at 166. Plain error does not exist unless but for the error the outcome of the trial clearly would have been otherwise. State v. Wickline (1990), 50 Ohio St.3d 114; Statev. Long (1978), 53 Ohio St.2d 91.
 {¶ 35} The record in this case does not even reflect whether any of the jurors actually chose to take notes, much less how that affected the outcome of the trial. Moreover, Defendant makes no argument in that regard. Thus, plain error has not been demonstrated.
 {¶ 36} The second assignment of error is overruled. The judgment of the trial court will be affirmed.
Brogan, J. and Young, J., concur.