OPINION
{¶ 1} This case arises from the murder of Vernon Brown on May 10, 2003. Defendant, Joseph Taylor, was charged with the aggravated murder of Brown while committing robbery; aggravated murder while committing aggravated burglary, aggravated robbery; and aggravated burglary, all with firearm specifications. Taylor was also charged with having weapons under disability. After a jury trial, Taylor was convicted of all charges, and was sentenced to life imprisonment on the murder charges (which were merged), three years on the firearm specifications (which were merged), six months on the weapons under disability charge, and seven years each on the aggravated burglary and aggravated robbery charges (which were not merged). In addition, the court ordered that all sentences be served consecutively. The result of the sentencing was that Taylor would not be eligible to be considered for parole for thirty-seven and a half years.
 {¶ 2} Taylor now appeals, raising the following assignments of error:
 {¶ 3} "I. Appellant was denied due process, as the verdicts were against the manifest weight of the evidence.
 {¶ 4} "II. Appellant was denied his constitutional right to effective assistance of counsel.
 {¶ 5} "III. Appellant was denied due process and a fair trial through the trial court's erroneous rulings.
 {¶ 6} "IV. Appellant was denied due process and a fair trial because of prosecutorial misconduct.
 {¶ 7} "V. The trial court erred by amending Appellant's sentence while he was not present in court in violation of Article I, Section 10, of the Ohio Constitution and theSixth Amendment to the United States Constitution.
 {¶ 8} "VI. The victim impact statement, which improperly offered the victim's family's sentencing recommendation, prejudiced Appellant."
 {¶ 9} After reviewing the record, we find the assignments of error without merit, except for the fifth assignment of error. Accordingly, the judgment of the trial court will be affirmed in part, reversed in part, and remanded for re-sentencing.
 I {¶ 10} In the first assignment of error, Taylor contends that his conviction was against the manifest weight of the evidence. To decide if a conviction is against the manifest weight of the evidence, an appellate court, after reviewing the record, "`weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" State v.Thompkins (1997), 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541, quoting from State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717. We should exercise our discretion to grant a new trial "`only in the exceptional case in which the evidence weighs heavily against the conviction.'"78 Ohio St.3d at 387, quoting from Martin.
 {¶ 11} In claiming that the verdict was against the manifest weight of the evidence, Taylor attacks the testimony of several prosecution witnesses. One such witness is David Vaughn. Vaughn was one of four men, including Taylor, who allegedly went to Vernon Brown's home on May 10, 2003, for the purpose of stealing money from a combination safe. According to Taylor, Vaughn's testimony should be rejected because Vaughn was an admitted thief and liar, and had abused drugs. Taylor also contends that Vaughn's testimony was self-serving, since Vaughn received favorable sentencing consideration for his testimony. We do not find these arguments persuasive.
 {¶ 12} In the first place, Vaughn did not receive a sentence that was significantly different from Taylor's sentence. At the time of trial, Vaughn had already pled guilty to aggravated murder, aggravated robbery, and aggravated burglary, all with firearm specifications, but had not yet been sentenced. Vaughn indicated that he expected to be sentenced to life imprisonment, and that the court would decide on a range for parole eligibility of twenty-eight to thirty-three years. While this is less than Taylor's thirty-seven and a half year wait for parole eligibility, Vaughn was only around twenty years of age at the time of his plea, and faced incarceration for a very lengthy portion of his adult life. Moreover, Vaughn was to be sentenced to life in prison, with no guarantee of parole; "eligibility" for parole does not mean that an individual will be paroled.
 {¶ 13} Furthermore, if testimony of co-defendants or accomplices is rejected solely on the basis of past criminal activity, accomplices would never be able to testify. The very nature of accomplices is that they have participated in criminal activity. In the present case, the jury knew about the sentencing consideration and about Vaughn's less than stellar qualities. The weight to be given Vaughn's testimony in view of these factors was for the jury to decide. We have previously noted that "[b]ecause the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility * * *." State v. Lawson (August 22, 1997), Montgomery App. No. 16228, 1997 WL 476684, Id. at *4.
 {¶ 14} An important consideration in evaluating the evidence is the fact that Vaughn's testimony was corroborated by other witnesses who had no motive to lie. We also note that Taylor admitted involvement in the murder to his girlfriend and to a close male friend. Both of these individuals testified for the State at trial.
 {¶ 15} The victim in this case, Vernon Brown, owned Brown's Nursery, which was located on Dayton-Greenville Pike, or St. Rt. 49. Mr. Brown lived in a home on the nursery complex, which consisted of several thousand acres. At the time of his death, Mr. Brown was 51 years old, and had a son named Matt. Unfortunately, Matt took money and things from his father. Word got around Matt's school, and other kids started taking things as well. One of the other people who stole things was Brian Hines. Hines was a young man to whom Mr. Brown and his wife had been very kind in the past. Mr. and Mrs. Brown had taken care of Hines since he was little, giving him a place to stay when he did not have anywhere to go. They also bought him Christmas presents.
 {¶ 16} At some point, Mr. Brown found out that Hines and Matt had been stealing things from him. Mr. Brown then told Matt that Hines was not allowed to come out to the house anymore. However, Hines continued to steal things from Mr. Brown's home. He returned three or four times, and brought other individuals with him, including David Vaughn. A few weeks before Mr. Brown was murdered, Hines and Vaughn went to Mr. Brown's home to steal whatever they could find. Because they did not want Mr. Brown to be there during the burglary, they drove by Mrs. Brown's home to see if Mr. Brown's car was there. At the time, the Browns were separated, and Mrs. Brown lived a few blocks away. On this particular trip, Hines and Vaughn stole various items, including some crossbows, a pistol, and a watch. They also broke into the garage, and into a separate room inside the garage that contained a large safe with a combination lock. On another occasion, Hines and Vaughn went to the property, but Mr. Brown was home. As a result, they left without trying to take anything.
 {¶ 17} After stealing the crossbows, Vaughn and Hines traded some of the property they had gotten to Joseph Taylor, in exchange for drugs. Vaughn had known Taylor "from the streets" for about a year before the murder.
 {¶ 18} Vaughn thought the safe with the combination lock may have contained a half-million or million dollars. Vaughn, Hines, and Taylor talked about the safe and whether Hines could get the combination. However, Hines said he did not have the combination and could not get it. Later, Vaughn and Taylor had more conversations about the safe with Gordon Sage, who was Taylor's friend. Vaughn, Taylor, and Sage concluded that the only way they could get into the safe was to hold Mr. Brown hostage and make him open the safe.
 {¶ 19} Subsequently, Taylor, Sage, and Vaughn got together to go to Mr. Brown's house and get into the safe. They met at Taylor's apartment, and Taylor said he was going to call one of his other friends, James Dossett. Vaughn did not know Dossett, but they needed someone else. Dossett was recruited because he was apparently experienced and knew what he was doing. They did not take Brian Hines that night because no one could trust him and he was too young.
 {¶ 20} Vaughn testified that he went to Taylor's apartment around 1:15 a.m., on May 10, 2003. Taylor and Sage were there, as well as Krystle Ballard, who shared the apartment with Taylor and their son, Daniel. Significantly, Vaughn's testimony in this regard was corroborated by Ballard, who said that she overheard a conversation that Vaughn, Taylor, and Sage had at the apartment in the early morning hours of May 10, 2003. According to Ballard, the three men were talking about the fact that there was a safe in Vernon Brown's garage, and about breaking into the safe.
 {¶ 21} Vaughn testified that the three men left Taylor's apartment, and went to Taylor's parents' home. Taylor's parents were not home at the time, but two girls (Shena and Rochelle DeForge) were there. Dossett also came to the house, and the four men talked about going to Vernon Brown's house and breaking in. Again, Vaughn's testimony was corroborated in this regard by Shena DeForge, who placed all four men (Vaughn, Sage, Dossett, and Taylor) at Taylor's parents' house, in dark clothing, on the night the crime took place. Shena also heard the men talking about a safe and money. According to Shena, after the men talked about the safe, they changed into dark clothes and left the house.
 {¶ 22} Notably, Shena was not shown to have any motive for lying. There were some discrepancies among witnesses as to specific times that events occurred and whether all the men changed into dark clothing at Taylors' parents' house. However, a number of witnesses in this case (including Shena and Vaughn) were using illegal drugs or were drinking alcohol on the night in question, so their recollection of specific times may have been impacted.
 {¶ 23} Vaughn indicated that the four men left Taylor's parent's house in Vaughn's truck. They were all wearing dark clothing because they did not want anyone to see them. All of them, except Dossett, wore bandanas so that they would not be recognized. They also all wore gloves so they would not leave fingerprints. In addition, they brought duct tape, black spray paint, a twenty gauge shotgun, and a 38 caliber revolver.
 {¶ 24} At trial, Vaughn identified a picture that had been taken of Taylor. The picture shows Taylor with a black revolver sticking out of his pants. According to Vaughn, the revolver in the picture was the same one that was taken to Mr. Brown's house the night of the crime. Rochelle DeForge, who was dating Taylor (at the same time he was living with Krystle Ballard) also identified the picture of Taylor with the revolver. Rochelle testified that she took this picture of Taylor at his apartment, within a few weeks of the crime.
 {¶ 25} The four men first drove past Mrs. Brown's home, to make sure that Mr. Brown's truck was not parked there. In contrast to other burglaries, they needed Mr. Brown to be at home so they could get the combination to the safe. They did not see the truck, so they drove to Mr. Brown's house and parked across the street, in the trees. At that point (according to Vaughn), it was 2:00 or 2:30 a.m. When they got to Mr. Brown's front yard, they discussed plans. A glass storm door to the house was closed, but the inside door was open. Consequently, the men were able to see Mr. Brown inside, in the front sitting room. He was asleep in a recliner.
 {¶ 26} Taylor and Sage stayed at the front, while Dossett and Vaughn went around to the back door. Taylor had the revolver and was supposed to hold Mr. Brown at the front of house. Vaughn and Dossett kicked in the back door and ran to the front of the house, where Dossett shot Mr. Brown in the legs with the shotgun. At the time, Mr. Brown was still asleep in the chair. The shotgun was filled with buckshot and the blast also knocked out the glass in the front storm door.
 {¶ 27} When Taylor came in the house, he put the gun to Mr. Brown's head and told Brown to give him the numbers to the safe. Brown was conscious and tried to give the men numbers. However, he seemed to be in too much pain to speak. Vaughn and Taylor then went out to the garage, kicked in the outer door, and also kicked in the door to the inner room where the safe was located. They used black spray paint on the motion detector and lights on the outside of the garage, so the lights would not come on. They were not successful in opening the safe, so Vaughn went back into the house. For the next hour, the men hit Mr. Brown in the head and legs, and threatened to kill Brown and his family. However, Mr. Brown was never able to give them the numbers to the safe. During this time, the men searched the house. The disarray from the search is apparent in photographs that were admitted at trial.
 {¶ 28} Before leaving, Vaughn and Taylor shot Mr. Brown, who was still in the recliner, and was awake and conscious. Vaughn shot twice and gave Taylor the revolver. Taylor then shot four times. As they left, Taylor said that Vaughn had missed and that Taylor had killed Brown. The cause of death was multiple gunshot wounds.
 {¶ 29} Sage stole some silver coins, but that was all they got from the burglary. The four men then drove back to Taylor's parents' house. When they arrived, they went into the basement, took all their clothes off, put them in a bag, and threw the bag into a hole in the basement. They did this to get rid of the evidence. At that point, a man came to the house and traded them some cocaine for the shotgun.
 {¶ 30} Again, this part of Vaughn's story was corroborated by another witness, who had no reason to lie. As we indicated, Shena and Rochelle DeForge were at Taylor's parents' house that evening. The girls were still there when the men came back. Rochelle was ill and was in a bedroom, but Shena was still awake. According to Shena, the four men had been gone about four hours and it was getting daylight out when they returned. When they came back, they were still dressed in dark clothes. They did not say anything, and went directly to the basement. Eventually, Shena went down to the basement, where she saw the men taking off the dark clothes and putting them in bags. Shena also saw a black handgun in the basement. Taylor told Shena to go back upstairs, and she complied. After the men came back upstairs, Shena saw a shotgun on the table. Subsequently, a man came to the house and traded them cocaine for the shotgun. Shena did not know the man. Shena, Vaughn, and Sage then did three lines of cocaine.
 {¶ 31} According to Shena, Taylor and Sage both watched the morning news before they left Taylor's parents' house. At that point, Shena and Rochelle also had to leave because Taylor's mother was returning home. Vaughn left and went to his own home, where he lied to his parents about what he had been doing. Later that day, Vaughn was arrested, in connection with the prior burglary at Mr. Brown's, not for Mr. Brown's murder. At some point, Vaughn lied to his parents again, and to his girlfriend, telling them that he had been with two black men, who had shot and robbed Mr. Brown.
 {¶ 32} After Taylor and Sage left Taylor's parents' home, they returned to the apartment they shared with Krystle Ballard. Like other witnesses, Ballard gave testimony implicating Taylor. According to Ballard, when Taylor and Sage came back to the apartment that morning, Taylor said, "It went bad. He was shot." Taylor told Ballard that Vernon Brown had been on the chair in the screened-in porch, and that they had "fucked up." He also said they had not been able to get into the safe. Later that day, Taylor, Sage, and Ballard watched the noon news, and saw that the Brown homicide was being investigated. That night, Taylor, Ballard, and their son spent the evening at a Motel Six. Sage stayed overnight in the motel room with them.
 {¶ 33} After Vaughn was released from jail in connection with the prior burglary at Mr. Brown's house, Vaughn met with Taylor at the apartment Taylor shared with Ballard. When Taylor asked Vaughn if he had said anything to the police about the murder, Vaughn said no. Taylor and Vaughn agreed that if anyone talked about the murder, they should die. Ballard overheard part of this conversation and testified about it. She heard Taylor asking Vaughn about what was known about the murder. She also heard Taylor tell Vaughn not to say anything about Mr. Brown's murder.
 {¶ 34} Taylor was not indicted for the murder until September, 2004. Shortly after the murder, or in the middle of May, 2003, Phillip Newland let Sage, Taylor, Ballard, and Daniel move into Newland's apartment. Newland was Taylor's friend and had known Taylor since junior high school.
 {¶ 35} Around June 21 or 22, 2003, a conversation about the Brown homicide took place at Newland's apartment. Taylor and others were present. The others were talking about the homicide, and Taylor was just pacing. Taylor and Newland then left the room because Taylor asked to speak privately with Newland. Taylor told Newland that he (Taylor) had "really fucked up." Taylor said he had shot somebody and was concerned that the other men who were with him would not keep their mouths shut. The three men that Taylor was concerned about were Vaughn, Sage, and someone named Jimmy, whom Newland understood to be Jimmy Dossett. Newland did not know anyone else named Jimmy. Newland promised Taylor that he would take the information "to his grave," because he and Taylor were very good friends. Ultimately, however, Newland did tell the police what Taylor had said. Again, there was no reason for Newland to fabricate this conversation.
 {¶ 36} In view of the above testimony, we feel there was more than substantial evidence corroborating Vaughn's account of the crime. There were a few inconsistencies, but many significant details of Taylor's involvement were corroborated by witnesses who had no reason to lie. Under the circumstances, any inconsistencies were insignificant and easily explainable by the fact that many witnesses were drinking, doing drugs, and partying the night that the crime occurred. Furthermore, Taylor's own admissions, made to more than one witness, were compelling evidence of his guilt. Accordingly, the verdict was not against the manifest weight of the evidence, and the jury did not lose its way, creating a manifest miscarriage of justice. Instead, the verdict was well-supported by the evidence.
 {¶ 37} Based on the preceding discussion, the first assignment of error is overruled.
 II {¶ 38} In the second assignment of error, Taylor claims he was denied the effective assistance of counsel. The first ground for this claim is that trial counsel failed to properly present impeachment evidence. More specifically, trial counsel allegedly failed to lay a proper foundation for presenting testimony from Antonio Green, who was offered as a defense witness.
 {¶ 39} To prevail on a claim of ineffective assistance of counsel, a defendant must show that:
 {¶ 40} "counsel's representation fell below an objective standard of reasonableness and that he has been prejudiced by his counsel's deficient performance, i.e., that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." State v.Woullard, 158 Ohio App.3d 31, 41-42, 2004-Ohio-3395,813 N.E.2d 964, citing Strickland v. Washington (1984), 466 U.S. 668,104 S.Ct. 2052, 80 L.Ed.2d 674, and State v. Bradley (1989),42 Ohio St.3d 136, 538 N.E.2d 373.
 {¶ 41} Before trial, the defense filed a list of fifty witnesses. Antonio Green was not included on this list. After the trial started, the defense filed an amended list of witnesses, adding "Tony Green." The defense then attempted to call Antonio Green during its case. Green had an attorney, who indicated that Green was involved in a pending criminal case and did not feel his testimony would be helpful to either side. The trial court then allowed the attorneys to voir dire Green in chambers about his testimony. Essentially, Green indicated that Vaughn had told him that he was with Brian Hines on the night that Vernon Brown was killed. According to Green, Vaughn also said that he had implicated Taylor, Sage, and Dossett because he did not want to see Hines get in trouble.
 {¶ 42} Following the voir dire, the State objected to Green's testimony because it was hearsay. The state also noted that the defense had not asked Vaughn about Mr. Green, nor had Vaughn been asked about statements that he made to Green. Accordingly, the testimony was not admissible for impeachment purposes. The trial court agreed with the State and refused to let Green testify. Subsequently, the court added that exclusion was appropriate because Green's testimony was cumulative, i.e., Vaughn had admitted telling people different stories than what he said on the witness stand.
 {¶ 43} We agree that trial counsel fell below an objective standard of reasonableness by failing to properly establish the predicate for Green's testimony. However, we also find that the error was not prejudicial. This evidence was cumulative, since Vaughn had admitted that he had told different stories about the crime to various people, including the police, his parents, and his girlfriend.
 {¶ 44} Taylor argues, however, that Green's evidence was different in character because it showed a remarkable degree of untrustworthiness and even malice on Vaughn's part, in that Vaughn implicated Taylor in a murder in which Taylor had taken no part, in order to extricate a guilty friend. However, there is simply no evidence to support this inference. The trial testimony indicates that Vaughn and Taylor had been friends for more than a year. Vaughn and Hines were also acquainted, at least well enough to visit Mr. Brown's home on three or four occasions to attempt to commit burglary. However, there is no showing of animosity between Vaughn and Taylor, nor is there evidence of any special relationship between Vaughn and Hines such that Vaughn would accuse three completely innocent men, just to protect Hines. Moreover, there is not even an apparent motive, since Vaughn pled guilty to aggravated murder and faced a life sentence.
 {¶ 45} Furthermore, the failure to admit Green's testimony was also not prejudicial because of the overwhelming evidence against Taylor. As we noted, Vaughn's testimony was corroborated in many significant ways by testimony from witnesses who had no motive to lie. Taylor, himself, also made very incriminating statements to two people who had no apparent reason to lie. Accordingly, even if the evidence from Green had been admitted, there is no reasonable probability that the result of the trial would have been different.
 {¶ 46} Taylor also raises three other areas of trial counsel's alleged deficient representation, including failure to object to the prosecutor's testifying or posing leading questions; failure to object to speculative testimony; and failure to object to testimony offered with a lack of foundation. We have reviewed the record in detail and find that the instances that Taylor relies on do not involve leading questions, speculative testimony, or lack of a foundation.
 {¶ 47} "A leading question is one that instructs the witness how to answer or puts words in his mouth to be echoed back."State v. Carruth, Montgomery App. No. 19997, 2004-Ohio-2317, at ¶ 53. One example of leading questions that Taylor cites involves the prosecutor's inquiry about threats that were made to Mr. Brown. In this regard, Vaughn was asked if he had threatened Mr. Brown. Vaughn said, "yes." Vaughn was also asked if he had threatened Mr. Brown's family. Again, Vaughn said, "yes." These questions did not suggest the answer that Vaughn was supposed to give. Vaughn could have said yes, or he could have said no. An attorney does not violate the prohibition against leading questions by asking if an individual threatened a crime victim, because the question does not suggest the answer.
 {¶ 48} In his brief, Taylor also claims that Vaughn provided a non-responsive answer to these questions that prejudiced Taylor. However, Vaughn only answered "yes" to the questions. The excerpt that Taylor relies on as non-responsive actually occurred in connection with a follow-up question. After Vaughn said that Mr. Brown and his family had been threatened, the prosecutor said, "How'd that happen? Tell the jury." Again, this was not a leading question. Vaughn responded by saying that "Uh . . . Joe [Taylor] said that we knew where his family lived, and uh . . . if he didn't cooperate, uh . . . that things would happen to them." This was a responsive answer to a question that was not leading.
 {¶ 49} Taylor also challenges trial counsel's failure to object to speculative testimony. For example, Deputy Torgeson testified that it appeared that a burglary had taken place at Mr. Brown's house. There was testimony that the house was normally exceptionally neat, but was in disarray after the crime, with drawers pulled out, and contents and property left on the floors. As we mentioned earlier, the disarray is also evident from the photos taken at the scene. Torgeson had been a deputy sheriff for about twenty-nine years at the time of his testimony and saw the disarray. He was competent to express an opinion that the property had been burglarized.
 {¶ 50} Finally, Taylor contends that trial counsel was ineffective in failing to object to testimony that was offered with a lack of foundation. In this regard, Taylor focuses first on testimony from Mr. Brown's cleaning lady (Thelma Jean Crutcher), who said that no one was ever upstairs and that the beds in a large upstairs bedroom were always made. Taylor claims this was speculation because Crutcher came only once a month and provided no foundation for knowing what happened when she was not there. However, Crutcher testified that she had been cleaning the house for fifteen years. In the last year, Crutcher and her sister had come once a month. Crutcher stated that it was a very neat house, and that there was never a door or closet door open, that everything was "just perfect." Crutcher also testified that she had been in every room of the house on previous sessions when she had been cleaning, and had been in the rooms upstairs as well as downstairs. The rooms were all tidy. The only thing out of place might be a bottle of shampoo or gel that might fall down in the bathtub.
 {¶ 51} Regarding the beds upstairs, Crutcher said that they were always made, and everything upstairs was very neat. After the murder, the beds were torn up, the mattress was off to the side, and the drawers and cabinets were open. Crutcher testified that these items were never like that before. This testimony was properly admitted, from a witness who had knowledge. In any event, there was no real dispute about whether a burglary had taken place.
 {¶ 52} The second area of evidence that allegedly did not have a foundation was testimony from Brian Hines about bruises on his arm. Hines was picked up by the police the day of the murder and was questioned. When police noticed bruises on his arm, he explained that he had gotten those bruises wrestling with friends. Hines also testified that the police had checked this information out and had found out that it was correct. Defense counsel failed to object to the question, and Taylor claims it was of particular significance because it was possible that Vaughn had been trying to protect Hines and that Hines, not Taylor, was involved in the murder.
 {¶ 53} Even if counsel should have objected, admission of the evidence did not prejudice Taylor. As we stressed earlier, not a single witness placed Hines at any of the scenes leading up to the murder or at any scenes after the murder. In contrast, the witnesses who directly observed events that night placed Taylor, Vaughn, Sage, and Dossett together at locations before and after the murder, with weapons, wearing dark clothing, changing from dark clothing and hiding clothes in bags, and talking about burglarizing and shooting someone. As we said, the evidence of Taylor's guilt was overwhelming. Accordingly, to the extent that trial counsel's performance was deficient, there is no reasonable probability that, absent the deficiency, the outcome of the trial would have been different.
 {¶ 54} Based on the preceding discussion, the second assignment of error is without merit and is overruled.
 III {¶ 55} In the third assignment of error, Taylor claims that he was denied due process and a fair trial because of the trial court's erroneous rulings. As support for this contention, Taylor mentions two instances where the trial court overruled objections to questions that the prosecutor asked. Taylor also objects to the admission of State's Exhibits 46, 47, 54-56, and 63.
 {¶ 56} As a preliminary point, we note that the trial court did not err in overruling the objections to the questions that Taylor has cited. These questions were not improper. For example, the State asked Taylor if anyone ever physically touched or hit Mr. Brown. This was a perfectly proper question, and was not leading, since it called for a "yes" or "no" answer.
 {¶ 57} The other matters being challenged are photographs. Exhibits 46 and 47 are photographs of carpeting, showing an outline of dirty or muddy shoe prints. These were part of a series of photos that showed muddy footprints on the back door, where it had been kicked in, and on the floor. The footprints were never matched to anyone. However, Vaughn testified that Dossett kicked in the back door to the house, and that Vaughn and Taylor later kicked in two doors in the garage. Vaughn said his own shoes were muddy, and that the doors he and Taylor kicked in were muddy. Under the circumstances, one could reasonably infer that the intruders left the muddy shoe prints on the carpet.
 {¶ 58} Trial courts have broad discretion in admitting evidence, and their decisions will not be overturned absent an abuse of discretion and material prejudice to the defendant.State v. Maurer (1984), 15 Ohio St.3d 239, 264-265,473 N.E.2d 768. As with the evidence of disarray in the house, the shoe prints were relevant because they establish that people were in the house on the night of the murder. Furthermore, there is nothing harmful or prejudicial about these photos; they simply show partial footprints on carpet.
 {¶ 59} Exhibits 54 and 55 are color shots of the decedent in his recliner, taken from different angles. Exhibit 56 is a black and white photo, taken at the side of the recliner, with just a portion of the decedent's head visible. Finally, Exhibit 63 is a color photo of the floor in front of the recliner, after Mr. Brown's body was removed. The defense objected to admission of these photos, but the trial court found that the photos were not cumulative because they each showed different details.
 {¶ 60} The Ohio Supreme Court has stressed that "admission of photographs is left to the sound discretion of the trial court."15 Ohio St.3d at 264. Additionally, the court has said that:
 {¶ 61} "[p]roperly authenticated photographs, even if gruesome, are admissible * * * if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number." Id. at paragraph seven of the syllabus.
 {¶ 62} We agree with the trial court that the photos were relevant and were not cumulative. The shots of the decedent are few in number, and they do show different angles of the scene. Evidence that can be seen in one photo is not visible in others. Consequently, we find neither an abuse of discretion, nor any prejudice in the admission of the photos.
 {¶ 63} Accordingly, the third assignment of error is without merit and is overruled.
 IV {¶ 64} The fourth assignment of error raises a denial of due process and a fair trial based on prosecutorial misconduct. The test for prosecutorial misconduct is "whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." State v. Smith
(1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883. "The touchstone of analysis `is the fairness of the trial, not the culpability of the prosecutor.'" State v. Cornwell, 86 Ohio St.3d 560, 570-571, 1999-Ohio-125, 715 N.E.2d 1144, quoting from Smith v. Phillips
(1982), 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78.
 {¶ 65} The first matter that Taylor focuses on is the trial court's threat to declare a mistrial after a disagreement occurred between counsel. After a defense objection to a question was sustained, a sidebar conference was held, during which the prosecutor took offense at defense counsel's attempt to tell him how to ask questions. At this point, the following exchange occurred:
 {¶ 66} "Mr. Franceschelli: I'll do — you know what . . .
 {¶ 67} "Judge Hall: Hang on.
 {¶ 68} "Mr. Franceschelli: . . . you ask your . . .
 {¶ 69} "Judge Hall: Hang on.
 {¶ 70} "Mr. Franceschelli: . . . ca — questions and I'll ask mine.
 {¶ 71} "Judge Hall: Just a minute."
 {¶ 72} Following this exchange, the court called a recess and spoke to counsel in chambers. The court indicated that further outbursts would result in a mistrial. This did not occur in front of the jury, and no further outbursts occurred. At one later point, the record does reflect that the prosecutor made a "sarcastic sigh."
 {¶ 73} In a recent case that involved an offensive outburst in front of the jury, we commented that:
 {¶ 74} "[w]e condemn the type of misconduct displayed and remind both prosecutors that they are servants of the law, subject to ethical considerations as well as disciplinary rules. Although charged with a duty to prosecute vigorously, they must remain professional and courteous to opposing counsel as well as the court." State v. Thompson, 161 Ohio App.3d 334, 342-343,2005-Ohio-2508, 830 N.E.2d 394, at ¶ 35.
 {¶ 75} In Thompson, we found no evidence that the conduct influenced the jury. 2005-Ohio-2508, at ¶ 36. We can make the same finding here. As we indicated earlier, the evidence against Taylor was overwhelming.
 {¶ 76} Taylor also relies on two instances where the prosecutor used foul language. However, these mishaps occurred during conferences in chambers, not in front of the jury. While this does not in any way excuse the lack of courtesy shown to the court and to opposing counsel, the prosecutor's conduct did not impact the fairness of the trial.
 {¶ 77} Another area of alleged misconduct was the prosecution's questioning of Rochelle DeForge about whether Taylor had been intimate with her or with other women during the time that he was living with Krystle Ballard. After a defense objection was sustained, the State explained that Rochelle had been asked this because she had been at the apartment Taylor shared with Ballard, and had taken the picture that showed Taylor with the black revolver.
 {¶ 78} The trial court agreed that this witness could be asked about the picture, However, the court wanted the State to avoid undue repetition of the fact that Taylor was dating two women at the same time. The court noted that this fact was already apparent to the jury. After the court's ruling, the State properly elicited information from Rochelle that she had taken a picture of Taylor with the gun at the apartment Taylor shared with Ballard. The State did not ask further questions on direct examination about Rochelle's relationship with Taylor.
 {¶ 79} Subsequently, the defense questioned Rochelle on cross-examination about a statement she had made to the police about Taylor taking her home from his parent's house the morning after the murder. Rochelle stated that she did not think that was true, and that she had probably been guessing about Taylor taking her home that morning. On re-direct examination, the State followed up in this way:
 {¶ 80} "Q. Did you write that because he drove you home or were you guessing?
 {¶ 81} "A. I was guessing. And I didn't think that [he took me home] because at that time I realized I was not allowed to see him, so we had to sneak to see him. He couldn't pick me up at my house."
 {¶ 82} The defense did not object to this question, and properly so, because the State was appropriately exploring a matter mentioned on cross-examination. Later, when Shena DeForge testified, the State asked Shena how she knew Taylor. Shena responded that "Rochelle was going out with him." The defense did not object to this, either, and yet it is one of the examples the defense relies on to show prosecutorial misconduct.
 {¶ 83} A defendant who fails to object to prosecutorial misconduct waives all but plain error. State v. Ballew,76 Ohio St.3d 244, 254, 1996-Ohio-81, 667 N.E.2d 369. Under this analysis, the plain error must be outcome-determinative in order to be recognized. 76 Ohio St.3d at 254-55.
 {¶ 84} Even if error occurred in the present case, it was not outcome determinative. In the first place, the jury was aware well before Rochelle DeForge's testimony that Taylor was living with one woman, while dating another. In explaining the events of the night of the murder, Vaughn mentioned that he, Taylor, and Sage met at an apartment where Taylor and Krystle Ballard were living. Vaughn then testified that the men later went to Taylor's parents' house, and that Rochelle DeForge, Taylor's girlfriend, was there. Thus, the jury learned nothing new when the relationship was mentioned during the testimony of Rochelle and Shena DeForge. We also do not feel that the State unduly emphasized this point.
 {¶ 85} Taylor additionally complains about the State's inquiry as to how long Vaughn and the others were out there "terrorizing" Brown, and to a few instances where defense objections to leading questions were sustained. In view of the events that occurred, the term "terrorizing" was not an exaggeration. For example, Vaughn testified that they were there for an hour, screaming at Mr. Brown, hitting him in the legs and head with the pistol and shotgun, and threatening to harm his family. We further note that the instances where objections were sustained to leading questions were isolated and did not affect the fairness of the trial.
 {¶ 86} Taylor's final claim of misconduct concerns comment in closing argument about admissions Taylor had made to Krystle Ballard after the murder. Specifically, Ballard testified as follows about statements that Taylor had made after he and Sage returned to Ballard's apartment in the morning, after the murder:
 {¶ 87} "Q. Okay. And did Joe say anything to you at that time?
 {¶ 88} "A. He said, `We fucked up. . . .' Or, no. He said: `It went bad. He was shot.'
 {¶ 89} "Q. Okay. And did he say anything else that you recall?
 {¶ 90} "A. It was quiet for a little while and then he said that he was on the chair in the screened-in porch, Vernon Brown.
 {¶ 91} "Q. Okay. And you mentioned something about fucked up?
 {¶ 92} "A. Yeah. And then after he had mentioned that, they — they had said, you know: `We fucked up.'
 {¶ 93} "Q. Okay. And do you know, uh . . . whether or not they were able to get in the safe?
 {¶ 94} "A. They were not able to.
 {¶ 95} "Q. Is that — and who said that?
 {¶ 96} "A. Joe."
 {¶ 97} According to Taylor, this testimony implies that Taylor only had second-hand knowledge gleaned from others about an incident at which Taylor was not present. Taylor further contends that in view of this interpretation, the prosecutor committed misconduct by saying in his closing argument that Taylor told Ballard that "We really fucked up."
 {¶ 98} However, we disagree, because Taylor's interpretation of the testimony makes no sense. If Taylor was not at the crime scene that night, he would not have known that Mr. Brown was on the recliner in the front sitting room, or that Brown was shot — or, in fact, that Mr. Brown even had a front sitting room. There was no evidence that Taylor had been to Mr. Brown's home before, nor is there any evidence that Taylor received some type of communication from someone else about the murder after it took place. There was also no explanation of why Taylor would have been privy to such information.
 {¶ 99} Rather than implying that Taylor had second-hand knowledge, the statements indicate that he had direct knowledge and was present at the crime scene. Therefore, the State did not commit misconduct in commenting on this point in closing argument. We also note that while the State inserted the word "really," before the words "fucked up," the State's comments are accurate in context. In this regard, the prosecutor said during closing argument that:
 {¶ 100} "And what happens next? The four of `em go off. And what happens after that? Two of `em come back. And what happens after that? The Defendant talks to Krystle Ballard. And what's he tell her? He tells her: `it went bad. Mr. Brown was shot. He was sitting in his recliner on the porch. We didn't get anything out of the safe.'
 {¶ 101} "And he — and then he tells her: `We really fucked up.' And then they end up watchin' the news that day, the noon news. And they're lookin' and that's when it's confirmed for her Vernon Brown is dead. The cleaning ladies found him. It's big news. It just happened."
 {¶ 102} After reviewing the record, we do not find either misconduct or prejudicial error in the closing argument. "`Prosecutors are entitled to latitude as to what the evidence has shown and what inferences can be drawn therefrom.' * * * The closing argument must be reviewed in its entirety to determine prejudicial error." Ballew, 76 Ohio St.3d at 255 (citations omitted).
 {¶ 103} Based on the preceding discussion, the fourth assignment of error is without merit and is overruled.
 V {¶ 104} In the fifth assignment of error, Taylor contends that the trial court erred by amending the sentence when Taylor was not present in court, in violation of Article I, Section 10, of the Ohio Constitution, and the Sixth Amendment to the United States Constitution. On February 11, 2005, the trial court filed a termination entry that purportedly reflected what had occurred at the sentencing hearing. However, the entry contained a provision that had not been discussed during the hearing. Specifically, the court indicated in the entry that the parole board could impose an additional nine month prison term for each post-release control violation, for a total of up to fifty percent of the original sentence imposed by the court.
 {¶ 105} Subsequently, on March 21, 2005, the court filed an entry correcting some clerical errors in the original termination entry. For example, the original entry stated that Taylor had been convicted of "AGGRAVATED MURDER (while committing . . .) — (UNCLASSIFIED FELONY) WITH THREE-YEAR FIREARM SPECIFICATION)." The amended entry stated that Taylor had been convicted of "AGGRAVATED MURDER (while committing Aggravated Burglary) — (UNCLASSIFIED FELONY) WITH THREE-YEAR FIREARM SPECIFICATION."
 {¶ 106} In addition to the clerical corrections, however, the amended entry included these statements about post-release control and parole supervision:
 {¶ 107} "With respect to Counts #5 and #6, the Court advised the Defendant that following the defendant's release from prison, the defendant will serve a period of up to five (5) years post-release control under the supervision of the parole board.
 {¶ 108} "* * *
 {¶ 109} "With respect to Counts #7 and #8, if the defendant is ever to be released by the Adult Parole Authority, the sentence includes parole supervision as determined by the Adult Parole Authority."
 {¶ 110} However, the court did not advise Taylor in the sentencing hearing about post-release control or about parole supervision. On May 10, 2005, the trial court filed a second amended termination entry that appears virtually identical to the one filed on March 21, 2005. Both of the amended termination entries also contained the provision indicating that the parole board could impose an additional nine month prison term for each post-release control violation, for a total of up to fifty percent of the original sentence imposed by the court. Again, this matter was not discussed during the sentencing hearing.
 {¶ 111} In State v. Jordan, 104 Ohio St.3d 21,2004-Ohio-6084, 817 N.E.2d 864, the Ohio Supreme Court held that trial courts have a statutory duty to provide notice of post-release control at the sentencing hearing, and that any sentence imposed without such notification is contrary to law.2004-Ohio-6085, at ¶ 23. Accordingly, the Supreme Court held inJordan that:
 {¶ 112} "when a trial court fails to notify an offender about postrelease control at the sentencing hearing but incorporates that notice into its journal entry imposing sentence, it fails to comply with the mandatory provisions of R.C. 2929.19(B)(3)(c) and (d), and, therefore, the sentence must be vacated and the matter remanded for re-sentencing." Id. at ¶ 27.
 {¶ 113} The amended sentences in this case did not cure the problem because they were void. Specifically, the trial court lacked jurisdiction to modify the sentence while the case was on appeal. Although the court could have corrected clerical errors in the termination entry, the items that were inserted were not merely clerical. See, e.g., Hernandez v. Kelly,
___ Ohio St.3d ___, 2006-Ohio-126, ___ N.E.2d.3d ___, at ¶ 20 (including post-release control provision in a sentence is constitutionally significant); State v. Mohamed, Cuyahoga App. No. 84615, 2005-Ohio-193, at ¶ 9 and n. 4 (once an appeal is perfected, the trial court lacks jurisdiction to modify the sentence except to correct clerical errors); and State v. Southerland (Dec. 30, 1999), Butler App. No. CA-99-01-013, 1999 WL 1279304, *4 (once an appeal has been perfected, an amendment to the sentencing entry, other than an administrative correction, is done without jurisdiction and is void). Moreover, the amended entries could not have corrected the defect in the original sentencing entry, because the trial court did not discuss post-release control or parole supervision at the sentencing hearing.
 {¶ 114} Based on the preceding discussion, the original sentencing entry must be vacated because the court failed to notify Taylor about post-release control at the time of the sentencing hearing. The amended sentencing entries could not correct this defect, and were also void because they were made at a time when the court was without jurisdiction to change the original entry, other than to correct clerical errors. Accordingly, the fifth assignment of error is sustained, and this matter will be remanded for re-sentencing.
 VI {¶ 115} The sixth assignment of error is based on a claim that Taylor was prejudiced by the victim impact statement, which improperly offered the sentencing recommendation of the victim's family. At the sentencing hearing, Mr. Brown's brother, John Brown, spoke on behalf of the extended Brown family. John indicated that the entire family felt Taylor should receive the maximum penalty available. He also said that many family members would prefer the death penalty if it were available. After making these remarks, John went on to discuss Vernon Brown's life and many contributions to the family and community.
 {¶ 116} Citing State v. Huertas (1990), 51 Ohio St.3d 22,553 N.E.2d 1058, Taylor contends that John Brown's statements improperly distracted the trial court from its duty to independently weigh mitigating factors against aggravating circumstances. We disagree.
 {¶ 117} Huertas was decided in the context of a capital murder case. There, the Ohio Supreme Court held that "[e]xpressions of opinion by a witness as to the appropriateness of a particular sentence in a capital case violate the defendant's constitutional right to have the sentencing decision made by the jury and judge." Id. at syllabus. In explaining its reasoning, the Supreme Court commented that statements by a victim's family that recommend a particular punishment "are simply opinions on the appropriate sentence given by someone who, though having a great personal interest in the outcome, is not a member of the jury. These opinions go to the ultimate issue, usurp the jury's function and undermine the defendant's right to trial by an impartial court." 51 Ohio St.3d at 27.
 {¶ 118} The considerations mentioned in Huertas are less significant in cases like the present, where the jury has already made its decision and there are no death penalty specifications. In addition, R.C. 2930.14(A) does require trial courts to permit crime victims to make a statement before the court imposes sentence. This is not an invitation for courts to consider irrelevant information, however. In fact, R.C. 2930.14(B) indicates that courts may redact information that is irrelevant and that will not be used for the court's sentencing decision.
 {¶ 119} We agree with Taylor that trial courts should not be influenced by a family member's opinion on what appropriate sentences should be. However, we found no evidence in this case that the trial court considered irrelevant factors. Trial courts routinely make judgments on appropriate sentences, and are well aware of the factors that should be considered. In the present case, the trial court made a reasoned judgment, and did not impose the maximum sentence on all counts. For example, the court could have sentenced Taylor to ten years on the first degree felonies of aggravated burglary and aggravated robbery. The court chose to impose only seven years. See R.C. 2911.11(A) and R.C.2929.14(A)(1). Consequently, the sixth assignment of error is without merit and is overruled.
 {¶ 120} Based on the preceding discussion, the first, second, third, fourth, and sixth assignments of error are overruled, and the fifth assignment of error is sustained. Accordingly, the judgment of the trial court is affirmed in part, is reversed in part, and is remanded for re-sentencing.
Grady, P.J., and Fain, J., concur.