OPINION
{¶ 1} Deandre D. Dewitt appeals from his conviction and sentence on three counts of aggravated robbery including two firearm specifications. Following a jury trial, Dewitt was found guilty and sentenced to three years in prison for each count; in addition, he was sentenced to three years in prison for each firearm specification. The *Page 2 
sentence was to run consecutively for a total of 15 years.
 {¶ 2} In support of his appeal, Dewitt raises the following assignments of error:
 {¶ 3} "I. The verdict against the defendant-appellant was not supported by the sufficiency of the evidence.
 {¶ 4} "II. The verdict against the defendant-appellant was against the manifest weight of the evidence.
 {¶ 5} "III. The trial court erred in overruling defendant-appellant's motion to suppress because the identification of the alleged suspects created a likelihood of irreparable misidentification.
 {¶ 6} "IV. The trial court erred in overruling defendant-appellant's motion to suppress because there was no probable cause to stop and arrest the defendant-appellant.
 {¶ 7} "V. The trial court abused its discretion when it denied defendant-appellant's motion for change of venue.
 {¶ 8} "VI. The trial court abused its discretion when it denied defendant-appellant's motion for eyewitness identification expert.
 {¶ 9} "VII. The trial court abused its discretion when it denied defendant-appellant's motion in limine."
 {¶ 10} Upon our review of the record, we do not find merit in Dewitt's assignments of error. The judgment of the trial court will be affirmed.
 {¶ 11} The present appeal stems from four robberies that occurred within a fifteen-day period in January of 2005. On January 12, 2005, Caitlin Jackson was robbed at gunpoint as she was entering her car outside of a friend's apartment building. *Page 3 
Although it was approximately 8:30 p.m., Jackson testified that she was parked under a street lamp, which allowed her to clearly see the face and gun of her robber. She described him as a black male, approximately five-seven to five-eight, wearing a black and yellow jersey with black pants and black zip-up hoodie. The hood was not over his head at the time of the robbery. Jackson also described the suspect as having thick, full black hair pulled back in a ponytail. She described the gun as being a black revolver that was kind of worn. According to Jackson, the robbery lasted for one and one-half minutes, during which time she stood within one and one-half feet of her robber as he took her purse, her car keys, and three gold chains off of her neck.
 {¶ 12} Jackson was presented with photo spreads of potential suspects on four separate occasions between January 24, 2005 and January 28, 2005, before identifying Dewitt as the man who robbed her. At trial, she testified that she immediately recognized the defendant upon seeing him in the last photo spread. She likewise identified Dewitt at trial.
 {¶ 13} As an alibi witness, the defendant offered the testimony of Mary Forbes, a family acquaintance, who stated that Dewitt was at her home between 5:30 p.m. and 10:30 p.m. on the night of the Jackson robbery having his hair braided by Forbes' granddaughter.
 {¶ 14} Next, at approximately 1:50 p.m. on January 19, 2005, Chris Jenks was robbed at gunpoint inside of a car at the Westbrook Village apartment complex as he waited for a colleague. Jenks testified that he saw a black male in his late teens, approximately five-nine, light skinned, and with a broad nose cross on the sidewalk in front of the car from Jenks' left to his right. The teen was wearing a black jacket with a *Page 4 
hood that was only partially covering his head. According to Jenks, soon after he lost sight of the young man, his car door opened, he felt a gun pressed to his neck, and that same person told him to give him all of his money and jewelry. Jenks testified that he was able to clearly see the robber's face, for he stood approximately one and one-half feet away from Jenks' face, and the entire encounter lasted between five and six minutes. He also described the gun as being a dark silver revolver. Furthermore, Jenks stated that the young man reached around him to grab a black bag in the back of the car, in addition to searching through Jenks' pockets and his colleague's purse. As the robber walked away, Jenks said he continued to have a clear picture of his face until the teen turned behind the apartment complex.
 {¶ 15} Jenks was shown several photo spreads of suspects on three different occasions. On January 20, 2005, he identified a man in one of the photo spreads as one who looked like the man who robbed him, but specifically stated he was not the same individual. Later, on January 28, 2005, Jenks identified Dewitt as his robber in the same photo spread shown to Caitlin Jackson. He also identified the defendant at trial.
 {¶ 16} In opposition to Jenks' testimony, Dewitt offered the testimony of Dr. Reva Cosby, a unit principal at Trotwood High School. Dr. Cosby testified that school records indicated Dewitt was in attendance at the time of the Jenks' robbery. Dr. Cosby also stated that she spoke to each of Dewitt's teachers regarding his attendance on January 19, and that they provided he was present. She noted this on the general attendance printout offered at trial. However, the records of these individual teachers were not presented into evidence. As a result, the written testimony as to what others told Dr. Cosby was redacted on hearsay grounds. *Page 5 
 {¶ 17} The third robbery occurred on January 27, 2005, at approximately 8:20 a.m. Shirley Ivery testified that she had just returned from taking her son to school when she was approached at gunpoint in the corridor leading to her apartment. She described the suspect as a black male in his early twenties, light skinned, and between five-seven and five-eight. He was wearing black jeans, a black coat and a black toboggan-type cap. According to Ivery, when the robber came at her with a gun, she screamed, ran into her apartment, and called the police. Although Ivery later identified Dewitt as the man who attempted to rob her, Officer Jonathan Emmel of the Trotwood Police Department testified that Ivery indicated during a police interview that she did not get a good look at the robber's face because she was running.
 {¶ 18} Dewitt offered the testimony of Dr. Cosby and Maurice Douglas, the supervisor of Trotwood High School's in-school suspension program, also known as "RAP." Both witnesses testified that Dewitt was present during school hours that day, and, specifically, that he was under Douglas' supervision in RAP. The state presented the testimony of rebuttal witnesses who stated that it was common for students recorded as being present in the RAP program to actually not be in their assigned rooms.
 {¶ 19} Following deliberation, the jury returned a verdict of Not Guilty as to the aggravated robbery charge involving Ivery.
 {¶ 20} The fourth robbery also took place on January 27, 2005. At approximately 8:45 p.m., Misty McDowell and her nephew, Brandon, had just parked their car in the driveway of the home of Ms. McDowell's boyfriend's mother when they were robbed at gunpoint by two black males wearing masks — one black and one royal blue. McDowell described one of the robber's as being six-one and weighing approximately 198 to 200 *Page 6 
pounds. He was wearing the black mask and a dark jacket. She described the second man as shorter, five-nine to five-ten, and weighing approximately 180 to 185 pounds. Although the robbery lasted over several minutes, McDowell testified that she could not identify the suspects in the subsequent photographic lineups because both had been wearing masks.
 {¶ 21} McDowell's boyfriend immediately called 9-1-1. When the police arrived, McDowell gave them the foregoing description of the suspects and a description of their guns. She testified that the taller suspect carried a heavy-looking black handgun, while the shorter suspect had a gun with a silver clip. She also indicated in which direction the suspects had fled.
 {¶ 22} Officer Jon Moeggenberg, the K-9 handler for the Trotwood Police Department, testified that he arrived on the scene shortly after the 9-1-1 call was made. There, McDowell pointed out a footprint in the yard allegedly left by one of her robbers; consequently, Moeggenberg began to track the suspects with the police K-9, Lola. Within nine minutes, the track led to 425 Vaniman Avenue, the residence of Dewitt. Additional officers were called to the residence, where a perimeter was set up and the occupants told to come out. After approximately thirty minutes, five young men, including the defendant, exited the home.
 {¶ 23} One of the individuals who came out of the house was Darrius Daniels. Pursuant to a plea agreement with the prosecuting attorney's office, Daniels testified at trial that he had been driving around the night of the robbery with Dewitt; the defendant's brother, Keith; Isaiah West; and Jesse Ogletree. According to Daniels, as the group was traveling up Stuckhardt Avenue toward Dewitt's home, Keith told him to *Page 7 
follow McDowell's vehicle until it pulled into the driveway of 310 Stuckhardt. Daniels and the others traveled on until they came to a stop sign. At that point, the defendant and Ogletree got out of the car and headed toward where McDowell had just parked. Moments later, Ogletree and Dewitt came running back to the car, at which time Ogletree got in, but the defendant continued running. Daniels testified that he eventually picked Dewitt up approximately three houses from the residence on Vaniman Avenue.
 {¶ 24} Furthermore, Daniels testified that back at the defendant's house, Dewitt told him they had robbed the woman up the street. He also stated that he observed Dewitt and Ogletree going through a woman's purse and finding a couple of credit cards, an identification card, a billfold, and a cellular phone. Daniels further testified that the purse was hidden in the chimney and weapons were hidden in the heat ducts once the police arrived.
 {¶ 25} After the young men exited the house and were taken to the police department, Detective Archie Swanson obtained consent from Dewitt's mother to search the residence. Inside, the officers found the contents of McDowell's purse in the bedroom shared by the defendant and his brother. The items found included a 20 dollar bill, a Kroger Plus card, a Chase Visa card on which appeared McDowell's name, a Books 
Company membership card, and McDowell's cell phone. In addition, the officers found two black coats, described by McDowell as the coats being worn at the time of the robbery; some ammunition in the closet; and three guns hidden in the heat duct along the west wall of the bedroom. A subsequent search was made on January 31, 2005, during which a black ski mask was found behind a venetian blind on a *Page 8 
windowsill also in the defendant's bedroom.
 {¶ 26} Dewitt was indicted on four counts of aggravated robbery in violation of R.C. 2911.01(A). Each count also included a gun specification in violation of R.C. 2929.14 and R.C. 2941.145. A jury trial was held, and Dewitt was found guilty on count one with a gun specification, count two with a gun specification, and count four without a gun specification. He was sentenced to three years in prison for each aggravated robbery charge and three years for each firearm specification to run consecutively for a total of fifteen years. It is from this conviction and sentence that the current appeal comes.
 I {¶ 27} In his first and second assignments of error, Dewitt claims that the state's evidence was insufficient to support his conviction and that the jury verdict was against the manifest weight of the evidence.
 {¶ 28} "`"[Sufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" State v. Thompkins (1997), 78 Ohio St.3d 380, 386,678 N.E.2d 541, citing Black's Law Dictionary (6th Ed.1990) 1433. The relevant inquiry when examining an appeal based on the sufficiency of the evidence is whether after viewing the evidence in a light most favorable to the state, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.State v. Dennis (1997), 79 Ohio St.3d 421, 430, 683 N.E.2d 1096
(citations omitted). A guilty verdict will not be disturbed on *Page 9 
appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." Id.
 {¶ 29} Here, Dewitt challenges the legal sufficiency of the evidence based on the following matters: 1) the defendant provided a credible alibi in all counts, 2) the conviction under counts one and two were founded solely on eyewitness testimony, and 3) the circumstances surrounding count four contained no physical evidence. Having reviewed the record, however, we disagree with Dewitt's contentions.
 {¶ 30} The evidence against Dewitt under counts one and two consisted primarily of eyewitness testimony. At trial, Caitlin Jackson testified that she had a clear, close view of the defendant's face for one minute and a half during the robbery because the parking lot was well lit and the encounter took place directly under a street lamp. In addition, Jackson gave a detailed description of Dewitt and the gun he was carrying, which matched the evidence found subsequent to the search on January 27, 2005, of the defendant's bedroom. Jackson further testified that she immediately recognized Dewitt in the photo spread on January 28, 2005, after having previously viewed multiple photo spreads to no avail. She also identified the defendant at trial.
 {¶ 31} Similarly, Chris Jenks testified at trial that he had a clear and close view of Dewitt's face during the robbery on January 19, 2005. According to Jenks' testimony, he had several opportunities to observe the defendant — as he walked in front of the car where Jenks was sitting, as he stood within one and one-half feet from Jenks during the robbery, and as he fled the scene behind one of the apartment buildings. In total, the robbery lasted between five and six minutes. Jenks also provided a description matching the physical characteristics of Dewitt and the features of the gun he carried. *Page 10 
Furthermore, Jenks testified that he was shown several photo spreads on three occasions before identifying Dewitt as the man who robbed him. We do not find merit in the defendant's argument that Jenks' identification of a suspect as one who looked like Dewitt serves to debilitate the state's evidence against him. At trial, Jenks stated that the identified individual merely looked like the man who robbed him, but clearly was not the same person.
 {¶ 32} As to counts one and two, we find that the testimony of the victim-eyewitnesses was adequate to establish the essential elements of aggravated robbery with a firearm specification, as both witnesses testified that Dewitt committed a theft offense with a firearm on his person and displayed and brandished the weapon. See R.C. 2911.01(A)(1); R.C. 2941.145. See, also, State v. Fletcher, Clark App. No. 2003-CA-62,2004-Ohio-4517, at ¶ 62 (finding the evidence sufficient to sustain the defendant's conviction, where eyewitness testimony was the primary means of identifying the perpetrator).
 {¶ 33} We also are not persuaded by Dewitt's argument that his conviction under count four was not supported by physical evidence. Although Misty McDowell testified at trial that she was unable to identify her robbers in a photo identification because they were wearing masks at the time of the crime, her physical description of their size and her personal items being found in the defendant's bedroom warrant a rational trier of fact in finding the essential elements of aggravated robbery proven beyond a reasonable doubt.
 {¶ 34} McDowell described one suspect as being six-one and weighing approximately 198 to 200 pounds, while the other was shorter, approximately five-nine *Page 11 
to five-ten, and weighing 180 to 185 pounds. The latter physical attributes match those of the defendant and are consistent with the victim-eyewitnesses from the other crimes. Moreover, McDowell testified that the suspects were wearing dark jackets and masks-one blue and one black.
 {¶ 35} In Dewitt's bedroom, the officers found a number of personal items from McDowell's purse, including a 20 dollar bill, a Kroger Plus card, a Visa card, a Books Company membership card and her cellular phone. They also found two black coats, one of which matched the description given by McDowell as the coat worn by one of the robbers, and a subsequent search revealed a black ski mask. This court has stated that "[t]he identity of a perpetrator may be proved by circumstantial evidence." State v. Reese, Montgomery App. No. 20246, 2004-Ohio-6674, at ¶ 15, citing State v. Franklin (1991), 62 Ohio St.3d 118, 124-25,580 N.E.2d 1. "Circumstantial evidence has the same probative value as direct evidence." Id. (citation omitted). When we view the evidence under count four in a light most favorable to the state, we believe a reasonable trier of fact could find beyond a reasonable doubt that Dewitt was one of the men who robbed McDowell.
 {¶ 36} Thus, we find that the defendant's conviction is supported by legally sufficient evidence.
 {¶ 37} Likewise, we do not find merit in Dewitt's contention that the verdict is against the manifest weight of the evidence. When a conviction is challenged on appeal as being against the manifest weight of the evidence, an appellate court reviews the entire record, "`weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the *Page 12 
jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"Thompkins, 78 Ohio St.3d at 387, quoting State v. Martin (1983),20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. Essentially, a reviewing court "sits as a `thirteenth juror' and makes its own independent review of the evidence and inferences derived therefrom, and assesses and weighs the credibility of each witness's testimony." Hagel, Ohio's Criminal Practice and Procedure (2006-07) 796, Section 41.207. However, "[b]ecause the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness. Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion." State v.Lawson (Aug. 22, 1997), Montgomery App. No. 16288, 1997 WL 476684, at *4. Only in exceptional circumstances should a judgment be reversed as being against the manifest weight of the evidence. State v. Frost,164 Ohio App.3d 61, 2005-Ohio-5510, 841 N.E.2d 336, at ¶ 16 (citation omitted).
 {¶ 38} In the present case, Dewitt asserts that the verdict was against the manifest weight of the evidence because 1) the credibility of his alibi witnesses outweighed the eyewitness testimony of the victims and 2) the testimony of the state's witness, Darrius Daniels, was prejudicially influenced by the plea agreement into which *Page 13 
Daniels entered with the prosecuting attorney.
 {¶ 39} In assessing this issue, we have reviewed the entire record and conclude that the verdict is well-supported by the evidence. "The credibility of the witnesses and the weight to be given to their testimony is a matter for the trier of facts, the jury here, to resolve." Reese, 2004-Ohio-6674, at ¶ 22 (citation omitted). We do not find the jury lost its way simply because it chose to believe the testimony of Caitlin Jackson and Chris Jenks over that of Dewitt's alibi witnesses, Mary Forbes and Dr. Reva Cosby. Furthermore, the jury was warranted in finding credibility in Daniels' testimony, where his statements merely corroborated the overwhelming evidence leading to Dewitt's conviction under the fourth count. This evidence includes Misty McDowell's description of the two robbers, the clothes they were wearing, and the guns they were carrying. It also includes the personal items belonging to McDowell that were found in the defendant's bedroom.
 {¶ 40} In reviewing this record as a whole, we cannot say that the jury lost its way and created such a manifest miscarriage of justice as to require reversal of Dewitt's conviction. The evidence does not weigh heavily against the defendant's conviction. Accordingly, the first and second assignments of error are overruled.
 II {¶ 41} Under the third assignment of error, Dewitt contends that the photo spread of the alleged suspects used to identify him by the victim-eyewitnesses created a likelihood of irreparable misidentification. Dewitt argues that the photo spread was tainted by the fact that five of the six individuals were present at 425 Vaniman the night *Page 14 
of January 27, 2005, and the defendant was the only suspect with long hair. Consequently, Dewitt claims that the trial court erred in overruling his motion to suppress the photo identification.
 {¶ 42} Where a defendant moves to suppress identification testimony, he or she bears the burden of showing that the identification procedure was "`so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification,'" and the identification itself was unreliable under the totality of the circumstances. State v.Sherls, Montgomery App. No. 18599, 2002 WL 254144, at *2, quotingNeil v. Biggers (1972), 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401.
 {¶ 43} This court has addressed the issue of suggestive photographic confrontations in State v. White (Feb. 2, 1994), Clark App. No. 3057,1994 WL 43095. There, we held the following:
 {¶ 44} "In many cases, and in almost all cases in which the criminal offender is not known to his victim or other eyewitnesses and is not arrested at the time of the crime, those who witness the crime are asked to identify the perpetrator for purposes of police investigation through some form of confrontation. This confrontation may be in the form of a `lineup,' a one-on-one `show up,' or from a photograph or series of photographs displayed to the witness. When any of these systems of confrontation suggest, due to the manner or mode of their presentation, that one individual is more likely than others to be the perpetrator of the crime, that fact increases the likelihood of m isidentif ication and violates the right to due process of law of a defendant so identified.Neil v. Biggers (1972), 409 U.S. 188. Identification testimony that has been tainted by an unduly or unnecessarily suggestive out-of-court confrontation may be suppressed on *Page 15 
that basis. Id.
 {¶ 45} "However, even when a confrontation is unnecessarily or unduly suggestive, the identification testimony derived from the confrontation is not inadmissible solely for that reason. Reliability of the testimony is the linchpin in determining its admissibility. Manson v.Brathwaite (1977), 432 U.S. 98. So long as the identification possesses sufficient aspects of reliability, there is no violation of due process.Neil v. Biggers, supra.
 {¶ 46} "Reliability is determined from the totality of the circumstances. Stovall v. Denno (1967), 388 U.S. 293. These circumstances include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself. Manson v.Brathwaite, 432 U.S. at 114.
 {¶ 47} "The foregoing due process concerns are implicated only if and when a confrontation is unnecessarily or unduly suggestive. State v.Per/man (1976), 49 Ohio St.2d 14. That prospect usually arises when the witness has been shown but one subject, whether in a `show up,' e.g.,Neil v. Biggers, supra, Stovall v. Denno, supra, or a single photograph, e.g., Manson v. Brathwaite, supra. Similarly, if the witness is shown pictures or photographs of several persons in which the photograph of one recurs or is in some way emphasized, undue suggestion may occur.Simmons v. United States (1968), 390 U.S. 377. However, even when the confrontation process is unduly or unnecessarily suggestive, the later identification testimony should not be excluded so *Page 16 
long as the identification itself is reliable. State v. Moody (1978),55 Ohio St.2d 64." Id. at *2.
 {¶ 48} We have examined the photo spread in question and find nothing that is unduly suggestive. The array consists of photos of six young black men who appear to be of similar ages. The photographs themselves depict each subject situated in front of the same plain background. Dewitt points out that his is the only photograph of a young black male with long hair — in the photo, his hair is in small braids that hang to approximately the middle of his neck. That fact alone, however, does not persuade us that this photo spread should be excluded as being unduly suggestive. Only Caitlin Jackson included hair length as part of her identification, and even then she stated that the young man who robbed her had thick, full black hair pulled back in a ponytail. Her description also included an approximate weight, height and age that matched the defendant's, based on the fact that she observed Dewitt for over one minute within a range of one and one-half feet under a lit street lamp. Jackson also testified that she was shown several photo spreads before identifying Dewitt.
 {¶ 49} The record indicates that Chris Jenks' identification also appears to be reliable. Jenks testified that he had several opportunities to clearly observe Dewitt's face during the robbery, as the entire encounter lasted for five to six minutes, and the defendant, at one point, was within one and half-feet from Jenks' face. Furthermore, Jenks stated that he watched Dewitt pass in front of the car prior to the robbery, and he watched as the defendant walked away from the car and disappeared behind a building following the robbery. Jenks' description of the defendant was similar to Jackson's — a late teen, black male, approximately five-nine, light skinned, and a broad nose. Jenks *Page 17 
also testified that he was shown several photo spreads before identifying Dewitt as the young man who robbed him.
 {¶ 50} Next, the procedure in which each witness was shown the photo spreads does not lead us to conclude that Dewitt's photograph was emphasized or presented in a suggestive manner as to taint the identifications. Both witnesses testified that the detectives who displayed the photo spreads first read a list of instructions cautioning them from identifying any suspects unless certain in their judgment. Jackson and Jenks signed each photo spread, indicating they understood the instructions. Moreover, both witnesses testified that neither detective influenced their decision or told them which suspect to choose prior to being shown the photo spreads.
 {¶ 51} Based on the foregoing, we find that the victim-eyewitnesses' identifications are inherently reliable under the totality of the circumstances. Both witnesses had the opportunity to observe Dewitt at close range, and the display of the photo spreads was not unduly suggestive. Therefore, Dewitt's third assignment of error is overruled.
 III {¶ 52} Dewitt claims under the fourth assignment of error that the trial court erred in overruling his motion to suppress because the police lacked probable cause to stop and arrest him. Specifically, Dewitt argues that the eyewitness testimony from victim Misty McDowell was insufficient on which to base a finding of probable cause because McDowell could only describe the suspects' height and weight. Further description of the robbers was not available because they were wearing masks. *Page 18 
 {¶ 53} We note that Dewitt did not raise the issue of probable cause in his motion to suppress filed on July 29, 2005, or in his supplemental motion to suppress filed on August 18, 2005. The trial court addressed this issue, however, pursuant to co-defendant Jesse Ogletree's motion after consolidating the matters for the purpose of the suppression hearing. The court overruled both defendants' motions to suppress on October 20, 2005.
 {¶ 54} We find that because Dewitt failed to raise the issue of probable cause in his motions to suppress, he has waived such issue on appeal. See Xenia v. Wallace (1988), 37 Ohio St.3d 216, 218,524 N.E.2d 889; State v. Schneider (Dec. 13, 1995), Greene App. No. 95-CA-18,1995 WL 737910, at *1.
 {¶ 55} Assuming, arguendo, that the defendant is permitted to challenge the trial court's ruling through his co-defendant's motion, we are not persuaded that the trial court erred in finding the requisite probable cause. Probable cause to arrest exists when "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." Beck v. Ohio (1964), 379 U.S. 89, 91, 85 S.Ct. 223,13 L.Ed.2d 142. See, also, State v. Timson (1974), 38 Ohio St.2d 122,67 O.O.2d 140, 311 N.E.2d 16, at paragraph one of the syllabus. Moreover, probable cause is a concept that must be based on the totality of the circumstances because it "deals with probabilities-the factual and practical nontechnical considerations of everyday life on which reasonable and prudent men act * * * ." State v. Snyder (Aug. 10, 1994), Montgomery App. No. 14089, 1994 WL 420918, at *2 (citations omitted). *Page 19 
 {¶ 56} Here, the record reflects that probable cause for the arrest of Dewitt was based on the physical description given by Misty McDowell, in addition to the outcome of the dog tracking conducted by Officer Jon Moeggenberg. Trotwood Police Officer Brandon Sucher testified at the motion hearing that McDowell gave him the following descriptions of the suspects, which the police used to identify Dewitt and Ogletree, at the time he arrived on the scene: "[Suspect number one was listed as] a black male described as being six foot, six-two tall, dark skin, wearing a black winter coat and dark-colored pants, dark-colored watch cap, referring to like a stocking cap, 180 to 190 pounds, displaying a black handgun, and the handgun was medium size in frame.
 {¶ 57} "Suspect number two was listed as a black male, medium, dark-brown complexion, thin with a dark-colored coat, dark-colored pants, approximately five foot nine, weighing 190 to 200 pounds, blue-colored ski mask and displaying a chrome silver handgun." (Supp. Hr'g Tr. at 15.)
 {¶ 58} Furthermore, Officer Moeggenberg described in detail the circumstances surrounding the dog tracking that led to 425 Vaniman Avenue, the residence of the defendant. He testified that McDowell pointed out a track in the snow that she indicated was left by one of the robbers. Moeggenberg led Lola to the footprint and gave her the command to begin tracking. Then, K-9 Lola followed the scent from the print up Stuckhardt Avenue to the corner of Stuckhardt and Macmillan before heading back toward Vaniman. Moeggenberg further testified that he observed tracks along the way that eventually led up the sidewalk and toward the yard at 425 Vaniman. In total, the track lasted nine minutes, while the actual arrest took place within approximately an hour of the crime being committed. *Page 20 
 {¶ 59} Based on the totality of the circumstances, we agree with the trial court's conclusion that probable cause existed. Thus, Dewitt's fourth assignment of error is overruled.
 IV {¶ 60} Under his fifth assignment of error, Dewitt contends that the trial court abused its discretion in denying his motion for a change of venue.
 {¶ 61} According to Dewitt, extensive news reporting about the robberies, the victims, and Dewitt's family effectively denied him of his constitutional right to a fair trial by a panel of impartial jurors. However, the record fails to include a transcript of the voir dire proceedings, and Dewitt does not offer any evidence of actual bias demonstrated by one or more of the jurors.
 {¶ 62} Preliminarily, we note that a trial court's decision to change venue will not be reversed absent a clear showing that it abused its discretion. State v. Nobles (1995), 106 Ohio App.3d 246, 257,665 N.E.2d 1137 (citation omitted). When making its decision, "the trial court examines the totality of the surrounding facts to determine whether pretrial publicity is likely to have created such an atmosphere in the county where the charge is pending that an impartial jury cannot be seated there." Id. The court's best opportunity to evaluate the impact of pretrial publicity is to examine the issue among potential jurors during voir dire. Id.
 {¶ 63} Here, Dewitt has failed to supply this court with transcripts of the voir dire proceeding. Without such transcripts, we are unable to address his error. In Knapp v. Edwards Laboratories (1980),61 Ohio St.2d 197, 15 O.O.3d 218, 400 N.E.2d 384, the Ohio Supreme Court stated: *Page 21 
 {¶ 64} "The duty to provide a transcript for appellate review falls upon the appellant. This is necessarily so because an appellant bears the burden of showing error by reference to matters in the record. SeeState v. Skaggs (1978), 53 Ohio St.2d 162, 372 N.E.2d 1355. This principle is recognized in App.R. 9(B), which provides, in part, that ` * * * the appellant shall in writing order from the reporter a complete transcript or a transcript of such parts of the proceedings not already on file as he deems necessary for inclusion in the record * * * .'When portions of the transcript necessary for resolution of assignederrors are omitted from the record, the reviewing court has nothing topass upon and thus, as to those assigned errors, the court has no choicebut to presume the validity of the lower court's proceedings, andaffirm." (Emphasis added.) Id. at 199.
 {¶ 65} There being no record before this court in order to review Dewitt's alleged error, we must presume that the trial court ruled appropriately. Thus, we find that there was no abuse of discretion. Defendant's fifth assignment of error is overruled.
 V {¶ 66} In his sixth assignment of error, Dewitt asserts that the trial court abused its discretion when it denied his motion for an eyewitness identification expert. Specifically, Dewitt argues that he has a right under the Sixth Amendment of the United States Constitution to offer the testimony of an expert psychologist on the accuracy and reliability surrounding any eyewitness identification. According to the defendant, an eyewitness identification expert was necessary in the present matter to remedy the alleged confusion experienced by the jurors due to the complexity and length of the trial. *Page 22 
 {¶ 67} The Ohio Supreme Court has held that expert testimony of an experimental psychologist concerning the variables or factors that may impair the accuracy of a typical eyewitness identification is adm issible under the rules of evidence, unless the expert testifies regarding the credibility of a particular witness. State v. Buell
(1986), 22 Ohio St.3d 124, 131, 22 OBR 203, 489 N.E.2d 795. The decision to admit the expert opinion testimony, however, is within the sound discretion of the trial court. Id. at 133. This court has found that it is not an abuse of discretion to deny expert testimony on factors affecting eyewitness identification where "the need for such assistance [is] obviated by the availability of other adequate means to challenge the state's eyewitness testimony." State v. Hutchinson (May 10, 1995), Montgomery App. No. CA 13993, 1995 WL 276753, at *8. Such adequate means include vigorous cross-examination of the state's eyewitnesses, the opportunity by defense counsel to comment on their testimony during closing argument, and court instructions on factors jurors may consider in assessing eyewitness testimony. Id.
 {¶ 68} Here, we do not find that the trial court abused its discretion in denying Dewitt's request for an expert on eyewitness identification. We turn our attention to the circumstances leading to Dewitt's conviction under counts one and two, for the state's evidence under these counts was based primarily on eyewitness testimony. First, we find that defense counsel had ample opportunity to cross-examine both Caitlin Jackson and Chris Jenks regarding their identification and to address the reliability of their testimonies during closing argument. At trial, both witnesses testified that they had the opportunity to clearly observe the defendant during the robbery. Jackson testified that her encounter with Dewitt occurred under a street lamp and lasted for over one minute, *Page 23 
while Jenks testified that he observed Dewitt outside at 1:50 in the afternoon, and the robbery itself lasted five to six minutes. Furthermore, the common description of Dewitt as being a young black male, approximately five-eight to five-nine, demonstrates the attention given by the witnesses at the time of the robbery, as does each witnesses' individual yet detailed description including features such as the length of the defendant's hair, the shape of his nose, the color and style of his clothes, and the characteristics of the gun he used. Both witnesses also testified that they were shown several photo spreads by the police department before identifying Dewitt as the man who robbed them, and both identified the defendant at trial.
 {¶ 69} Next, the trial court gave the following instruction to the jury regarding the factors they could consider in evaluating the credibility of the eyewitness testimony:
 {¶ 70} "Some things you may consider in weighing the testimony of identifying witnesses are as follows: Number one, the capacity of the witness; that is, their age, intelligence and the opportunity of the witness to observe. Number two, the witness's degree of attention at the time he or she observed the offender. Number three, the accuracy of the witness's prior description or identification, if any. Number four, whether the witnesses had occasion to observe the defendant in the past. Number five, the interval of time between the event and the identification. Number six, all surrounding circumstances under which the witness has identified the defendant, including deficiencies, if any, in the photo display." (Tr. at 592-93.)
 {¶ 71} In Buell, the court stated that "`[i]t is doubtless true that from personal experience and intuition all jurors know that an eyewitness identification can be mistaken, and also know the more obvious factors that can affect its accuracy, such as *Page 24 
lighting, distance, and duration.'" 22 Ohio St.3d at 131. We recognize that a psychologist expert may have provided testimony on the factors affecting the eyewitness identification in this case that are beyond common experience. However, given Dewitt's opportunity to thoroughly cross-examine the state's eyewitnesses, his ability to question their reliability in closing argument, and the court's instructions on factors to consider in assessing eyewitness testimony, we do not find the trial court's decision to overrule Dewitt's motion requesting an expert witness to be an abuse of discretion.
 {¶ 72} We also believe it is relevant that the jury acquitted Dewitt of the charge involving Shirley Ivery. Impliedly, this verdict illustrates the jury's ability to discern factors increasing or decreasing the reliability of the eyewitness identifications at issue in this matter.
 {¶ 73} Accordingly, the sixth assignment of error is overruled.
 VI {¶ 74} Dewitt contends in his seventh and final assignment of error that the trial court abused its discretion in denying his motion in limine to exclude evidence of dog tracking. The defendant mistakenly bases his argument on People v. Willis (Cal.App.2004), 115Cal.App.4th 379, 9 Cal.Rptr.3d 235, where the court found that dog scent and scent transfer unit ("STU") evidence failed to meet the test for reliability of scientific techniques involving novel devices or processes. Id. at 386. As noted by the California court, however, dog scent evidence is different from dog tracking evidence, and essentially less reliable, in that the former involves a dog being given a scent from a gauze pad some length of time after an alleged incident occurs and then being observed *Page 25 
to see if the dog "shows interest" in various locations frequented by a defendant. Id. On the other hand, dog tracking involves trailing a suspect and giving "an unambiguous alert that the person has been located." Id. The court further stated that the main problem with using the dog scent technique to identify people in criminal investigations is that there is less scent with which to work compared to tracking cases.
 {¶ 75} Cases throughout Ohio demonstrate that dog tracking is admissible, provided that the state establishes a proper foundation. SeeState v. Pearson, Montgomery App. No. 21203, 2006-Ohio-5585, at j11, citing State v. Dickerson (1907), 77 Ohio St. 34, 82 N.E. 969. To establish a proper foundation, the state must present evidence of the training and reliability of the dog, the qualifications of the person handling the dog, and the circumstances surrounding the trailing by the dog. Id. (citations omitted).
 {¶ 76} Preliminarily, we note that an appellate court will not reverse the trial court's admission of evidence unless there was an abuse of discretion. State v. Taylor, Montgomery App. No. 20944, 2006-Ohio-843, at ¶ 58 (citation omitted). An abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable.State v. Brown, Greene App. No. 2003-CA-69, 2004-Ohio-6787, at ¶ 9.
 {¶ 77} Furthermore, the record indicates that Dewitt failed to renew his objection at trial to the admissibility of the dog tracking evidence. His failure to object constitutes a waiver of that issue on appeal, absent a finding of plain error. See State v. Cephus,161 Ohio App.3d 385, 2005-Ohio-2752, 830 N.E.2d 433, at ¶ 34. Plain error does not exist unless it can be said that but for the plain error, the outcome of the trial would clearly have been different. State v.Long (1978), 53 Ohio St.2d 91, 97, 7 O.O.3d 178, *Page 26 372 N.E.2d 804.
 {¶ 78} Here, Officer Jon Moeggenberg testified extensively regarding his training as a K-9 handler and police officer and K-9 Lola's training as a police dog. He indicated that both he and Lola are certified as a team with the State of Ohio through the Ohio Police Officer's Training Academy. Officer Moeggenberg is also certified in Ohio to evaluate other police dogs as teams. Moreover, Officer Moeggenberg testified that he began his partnership with Lola in December of 2004 and that he maintains a weekly training program consisting of eight hours of tracking exercises. According to Officer Moeggenberg, Lola has not had any problems with tracking; instead, she has continued to improve over time.
 {¶ 79} Officer Moeggenberg also gave a detailed account of the track that he and Lola followed on January 27, 2005, which led them to 425 Vaniman Avenue. He testified that a woman on the scene, i.e., Misty McDowell, pointed out a track in the snow that she indicated was left by one of the robbers. McDowell also stated that the young men ran off in a direction north of the driveway. Officer Moeggenberg provided that he led Lola to the footprint and gave her the command to begin tracking. She pulled him up Stuckhardt Avenue to the corner of Stuckhardt and Macmillan, and then she headed back toward Vaniman. Officer Moeggenberg further testified that he observed tracks along the way that eventually led up the sidewalk and toward the yard at 425 Vaniman. There, he ended the track.
 {¶ 80} Upon review of Officer Moeggenberg's testimony, we find that the state established a proper foundation for the admission of the dog tracking evidence. There was substantial testimony demonstrating Officer Moeggenberg's qualifications as a *Page 27 
police dog handler, his and the K-9 Lola's training and reliability, and the circumstances underlying the track that took place on January 27, 2005. The record also shows that the trial court properly cautioned the jury as to the probative value of dog trailing evidence. The court stated, "Dog-trailing evidence must be viewed with the utmost of caution. It is of slight probative value. It must be considered in conjunction with all of the testimony in the case and does not warrant a conviction absent some other direct or circumstantial evidence of guilt." (Tr. at 591.)
 {¶ 81} In conclusion, we find that the court did not abuse its discretion or commit plain error in admitting evidence of the dog track on January 27, 2005. The state presented a proper foundation, and the trial court appropriately cautioned the jury against giving the evidence undue weight. Accordingly, Dewitt's final assignment of error is overruled.
 {¶ 82} For the aforementioned reasons, the judgment of trial court is affirmed.
GRADY and WALTERS, JJ., concur.
(Hon. Sumner E. Walters, retired from the Third Appellate District, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.) *Page 1